## IN RE LOWRIE.

The provisions of the act of the general assembly (section 1026, General Statutes) which prohibits the summoning and impaneling of a grand jury in any criminal court, for the prosecution of any felonious crime therein, and which require the prosecution of all offenses, when originally commenced or instituted therein, to be upon information presented by the district or special district attorney, are in conflict with the mandates of the bill of rights of this state, and are therefore unconstitutional.

PETITION for writ of *habeas corpus.*　The facts are stated in the opinion.

Mr. GEO. H. KOHN and Mr. S. E. BROWNE, for petitioner.

Attorney-General T. H. THOMAS, for the people.

BECK, C. J.　The petitioner charges, in his petition for the writ of *habeas corpus*, that he is illegally deprived and restrained of his liberty by confinement at hard labor in the state penitentiary, under a judgment of the criminal court of Arapahoe county, rendered against him upon a conviction for grand larceny.

The illegality charged is that he was not proceeded against criminally for said offense upon the presentment

or indictment of the grand jury, but upon an information filed by the district attorney of the second judicial district. He alleges that the matter complained of renders his trial and conviction void.

. The petition questions the constitutionality of section 23 of the act of the legislature approved February 7, 1883, entitled "An act to provide for the organization and maintenance of criminal courts; to prescribe the jurisdiction, powers, proceedings and practice of said courts, and to define the duties and qualifications of the judges and other officers connected therewith, and to repeal * * * all other acts and parts of acts inconsistent with this act."

This act provides that criminal courts shall be courts of record, and shall have concurrent jurisdiction with the district courts of the same counties in all criminal cases not capital, and such appellate jurisdiction as may be provided by law.

It is further provided that they shall be governed by the practice and proceedings which are now, or may hereafter be, prescribed by law for district courts in criminal cases, so far as the same can be made applicable and are not inconsistent with the provisions of this act.

The district attorney of the judicial district in which any criminal court is established is made prosecuting attorney of the criminal court, and power is conferred upon the judge of said court to appoint a special district attorney, when necessary, to perform the service of the district attorney.

The portion of the act complained of as obnoxious to the state and federal constitutions is section 23, which dispenses with the grand jury and provides for the prosecution of offenses in said court, upon informations filed by the district or prosecuting attorney. Section 23 is as follows: "No grand jury shall be summoned or impaneled in any criminal court, but the prosecution of all offenses, whether denominated felonies or misdemeanors

when originally commenced or instituted in such court, shall be by information presented to and filed in said court; such information shall be signed, verified and presented by said district attorney, or by the special district attorney appointed by the court, as provided by this act."

The balance of the section prescribes the manner in which informations shall be verified, and that the verification shall not be taken on the trial as evidence of the truth of the information; also that the verification shall not be read by nor submitted to the jury trying the case.

The statutory punishment for the offense of which petitioner was convicted, grand larceny, is confinement in the penitentiary for a term not less than one nor more than ten years. The petitioner was, therefore, convicted of a felony, as the term is defined by section 4, article 18, of the constitution, which is: "The term 'felony,' wherever it may occur in this constitution, or by the laws of this state, shall be construed to mean any criminal offense punishable by death or imprisonment in the penitentiary, and none other."

The offense for which he was convicted came also within the list of infamous crimes as defined by statute. Gen. Stats. sec. 944. After the filing of the information against the petitioner in the criminal court, he moved said court to quash the same, upon the grounds that it charged an infamous crime, which could only be prosecuted upon a presentment or indictment of a grand jury; that the statute providing for the filing of informations by the district attorney was unconstitutional and void; that the law for the punishment of crime is general in its nature and must have a uniform application to the entire state; and because the prosecution upon information for such crimes is contrary to the constitution of the United States. This motion was denied, to which ruling of the court the petitioner duly excepted.

Counsel for the petitioner cite several sections of the state constitution which they claim have been violated

by the enactment of the statutory provisions complained of, among which are the following:

Article 2, section 8. "That until otherwise provided by law no person shall for a felony be proceeded against criminally otherwise than by indictment, except in cases arising in the land or naval forces, or in the militia when in actual service in time of war or public danger. In all other cases offenses shall be prosecuted criminally by indictment or information."

Article 2, section 23. "The right of trial by jury shall remain inviolate in criminal cases, but a jury in civil cases in all courts, or in criminal cases in courts not of record, may consist of less than twelve men as may be prescribed by law. Hereafter a grand jury shall consist of twelve men, any nine of whom concurring may find an indictment; provided, the general assembly may change, regulate or abolish the grand jury system."

The attorney-general, who appears for the state, is of opinion that the proceedings had in the criminal court are valid, and that the statute authorizing prosecutions upon information of a district attorney is constitutional.

He contends that the entire grand jury system is nothing else than a rule of practice or a mode of proceeding, and quotes section 28 of article 6 of the constitution to show that rules of practice are only required to be uniform in courts of the same class or grade. The section quoted is as follows:

"All laws relating to courts shall be general and of uniform operation throughout the state, and the organization, jurisdiction, powers, proceedings and practice of all courts of the same class or grade, so far as regulated by law, and the force and effect of the proceedings, judgments and decrees of such courts severally shall be uniform."

He calls attention to the fact that the act of the general assembly in question provides for the organization of criminal courts, prescribes a uniform system of pro-

ceeding and practice for such courts throughout the state, and generally conforms to the constitutional requirements above mentioned.

Relying upon the soundness of the foregoing propositions, the attorney-general concludes that no conflict exists between the criminal court act of February 7, 1883, and said sections 2 and 23 of article 2 of the constitution.

As to said section 2: "That until otherwise provided by law, no person shall, for a felony, be proceeded against criminally otherwise than by indictment," he points to the above-mentioned act of the general assembly, and says it has been " otherwise provided by law," as required by the above sections.

It is also strongly urged in the argument that section 23 of article 2, and section 28 of article 6 of the constitution, afford ample authority for abolishing the grand jury system as to the criminal courts, leaving it in force as to the district courts.

We are of opinion that counsel for the state has fallen into two grave errors: 1. In assuming that all constitutional requirements are satisfied when the procedure or practice is made uniform in courts of the same class or grade, in accordance with the provisions of section 28 of article 6. 2. That this system may be abolished as to one class of courts having jurisdiction of felonies not capital, to wit, criminal courts, and that it may remain in force in another class of courts having general jurisdiction of all felonies throughout the state, viz., district courts.

The above-mentioned propositions do not seem to reach the merits of the objections raised by the petition and record as to the unconstitutionality of that part of the act of 1883 which provides that "no grand jury shall be summoned or impaneled in any criminal court," etc.

It is true that section 28 of article 6 of the constitution requires the practice and proceedings of all courts of the same class or grade to be uniform. It is also true that

the three criminal courts now existing in the state for the respective counties of Arapahoe, Pueblo and Lake are the only courts now existing of that class or grade. But it does not follow that an act of the general assembly, assuming in its title to provide for the organization of these courts, and to prescribe the jurisdiction, powers, proceedings and practice thereof, can abolish, as to this class of courts alone, and as to the citizens in the particular sections of the state over whom they may exercise jurisdiction, the grand jury system. This institution has come down to us from Magna Charta, and has ever been regarded by the masses as a protection against arbitrary and malicious prosecutions.

When the legislature undertakes to abolish as to a portion of the state rights and privileges guarantied by both the state and federal constitutions to the whole people of the state, until stricken out of the fundamental law, it should look beyond a particular provision of the constitution intended only to regulate the practice and proceedings of the different classes of courts, so that the same should be uniform in those of the same class or grade.

Such uniformity was never intended to be attained by ignoring or abolishing the fundamental rights of any portion of the people. The legislature may prescribe the practice and proceedings of the courts, but such power must be exerted within constitutional limitations and restrictions.

The grounds assigned by the petitioner in his application for the writ of *habeas corpus*, and the grounds upon which his motion to quash the information filed against him in the criminal court were based, raise highly important questions of constitutional law.

The right of a state to abolish the grand jury system as to all its inhabitants is not necessarily involved. That a state may abolish this system, and adopt that by information, without violating the restrictive provisions of

the fourteenth amendment to the constitution of the
United States, is settled by the case of *Hurtado v. Cali-
fornia*, 110 U. S. 516.

Nor is the constitutionality of the criminal courts ques-
tioned in this proceeding.   That portion of the act pro-
viding for their organization, etc., which attempts to
abolish the grand jury system and to substitute that by
informations, as to such courts, may be held invalid and
the remainder of the act may be sustained.   Cooley's
Const. Lim. 178; *People v. Rucker*, 5 Colo. 455.

The essential question presented for our consideration
is, Has the general assembly the power, under the re-
strictions of the federal and state constitutions, to abolish
the grand jury system as to the criminal courts only, and
to substitute as to them the system of prosecuting fel-
onies by information, leaving the grand jury system in
full force and effect as to the district courts throughout
the state?

The criminal courts are courts of record; their judg-
ments are final, and writs of error from the supreme court
lie thereto in the same manner as to judgments of the
district courts.   But the proposition of petitioner's coun-
sel that the criminal courts are of the same class or grade
as the district courts, within the meaning of the consti-
tution, is untenable.   That instrument, in providing for
the organization and jurisdiction of courts, made specific
provision for the creation of criminal courts, to have
criminal jurisdiction, and that limited to crimes not cap-
ital.   But in the creation of district courts they were
given general jurisdiction, both as to criminal and civil
matters.

The fact that the jurisdiction of both courts was made
concurrent in criminal cases not capital does not make
them courts of the same class or grade.   They were not
thus created, and the jurisdiction of one is essentially
different from that of the other.

Let us now consider the effect of the act of 1883 upon

the criminal jurisprudence of this state in respect to its constitutionality. In all but three counties of the state no person can, for a felony, be prosecuted otherwise than upon an indictment of a grand jury. In said three counties this right of an investigation of the charge by a grand jury is only recognized in prosecutions instituted in the district courts, while prosecutions originally instituted in the criminal courts, in the same grade of criminal offenses, are prosecuted upon informations of the district attorney. If the provisions of the state constitution, that, until otherwise provided by law, no person shall, for a felony, be proceeded against criminally otherwise than by indictment; and if the power conferred upon the general assembly to provide otherwise is that granted by section 23 of article 2, as we think it is, viz., "provided the general assembly may change, regulate or abolish the grand jury system," then the question arises, How must this power be exercised?

Clearly, if the object of the grand jury system is to guard certain fundamental rights of every citizen of the state, it follows, according to elementary principles of construction, that the change, regulation or abolition of the system must be so made as to equally affect the whole community in respect to the same rights and immunities, under the same or similar circumstances.

It cannot reasonably be contended that such is the effect produced by the act of February 7, 1883. The effect of such legislation to the citizen is, if he be charged with the commission of a felony or infamous crime not capital, within the jurisdiction of a criminal court, an information may be filed against him therein, upon the oath of a single informer, and he may be put upon his trial therefor; whereas, if charged with the commission of the same offense outside of such jurisdiction, or if proceedings be instituted against him within such jurisdiction, but in a district court instead of a criminal court, he would be accorded the right and privilege

of having the truth of the charge investigated by a grand jury composed of his peers, before he could be put to the expense, inconvenience and disgrace of a public trial. It may be an open question whether the proceeding by indictment secures to the accused any superior rights and privileges over that by information, but such fact does not alter the constitutional question here presented.

The delegates of the people in framing the constitution provided the grand jury system for the prosecution of infamous crimes, and prohibited their prosecution in any other manner until that system should be abolished. This circumstance, and the further fact that the people ratified the instrument, affords strong evidence that the people then favored this time-honored institution as that best suited to afford equal protection of the laws to all citizens.

It is a well-known fact, and appears in the reports of the proceedings of the constitutional convention, that the delegates were divided in opinion as to whether the grand jury system should be retained or not; but upon a final vote, after the subject had been debated, the vote was largely in favor of retaining that system, subject to the power of the legislature to change, regulate or abolish it. After the work of the convention had been completed, a committee of that body was appointed to prepare an address to the people, informing them of the main features of the instrument framed for their " *adoption or rejection.*" Concerning the grand jury, the address stated, under the title "bill of rights," as follows: "The grand jury system has been so modified as to make a grand jury consist of twelve men instead of twenty-three — any nine of whom concurring may find a bill; and the question whether it may not be abolished altogether is left to the legislature."

This portion of said address to the people, coupled with the language of the instrument itself, shows the understanding of the framers of the constitution, and, infer-

entially, the understanding of the people, that it was the expression of their will, at that time, that the grand jury should be retained, subject to the power of the general assembly to change, regulate or abolish it. But the people conferred on that body no power to abolish the institution as to one man, leaving it in force as to another; no power to abolish it as to one county, and not as to all counties; and certainly no power to enact a law which would, to any extent, leave it to the discretion of district attorneys or examining magistrates whether an individual should have the advantage of an investigation by a grand jury, or be put to a public trial without such investigation.

The fact that the people, in adopting the constitution, intelligently adopted the provisions concerning the grand jury, and the undisputed fact that most of the states have retained in their constitutions the same system, tend to show that it is held in high esteem as affording valuable securities to the people.

Constitutions are practically the work of the people themselves; their agents or delegates frame them, but they are of no force until inspected and adopted by the people.

Since such slight importance was attached to this venerable institution by the legislature, it being treated as a mere regulation of practice in the courts, and the effect of their action upon individual rights being apparently ignored, we insert some quotations from eminent authors and jurists to show the estimation in which the grand jury has been held by the people.

Chief Justice Shaw, speaking of the provision made for the system in the constitution of Massachusetts, says: "We are to look at it as the adoption of one of the great securities of private right, handed down to us as among the liberties and privileges which our ancestors enjoyed at the time of their emigration, and claimed to hold and retain as their birthright. * * * The right of individ-

ual citizens to be secure from an open and public accusation of crime, and from the trouble, expense and anxiety of a public trial, before a probable cause is established by the presentment of a grand jury, in cases of high offenses, is justly regarded as one of the securities to the innocent against hasty, malicious and oppressive public prosecutions, and as one of the ancient immunities and privileges of English liberty." *Jones v. Robbins*, 8 Gray, 342.

Chancellor Kent, referring to the provisions intended to guard the right of personal security, says they have been transcribed into the constitutions of this country from Magna Charta and other fundamental acts of the British parliament. He further says: "The substance of them is, that no person, except on impeachment and in cases arising in the naval and military service, shall be held to answer for a capital or other infamous crime, or for any offense above the common law degree of petit larceny, unless he shall have been previously charged in the presentment or indictment of a grand jury." 2 Kent's Com. 12.

Mr. Wharton says: "In the time of James II.   *   *   * a barrier was needed against frivolous state prosecutions, and this barrier grand juries presented.   *   *   *   In our own times a restraint is required upon the malice of private prosecutions and the violence of popular excitement, and it is to the adequacy of grand juries for that purpose that public attention has been turned." 1 Whart. Crim. Law, sec. 452.

Says Judge Story: "When our more immediate ancestors removed to America they brought this privilege with them as their birthright and inheritance, as a part of that admirable common law which had fenced round and imposed barriers on every side against the approaches of arbitrary power." Story's Const. sec. 1779. Again he says: "It is obvious that the grand jury perform most important public functions, and are a great security

to the citizens against vindictive prosecutions, either by the government, or by political partisans, or by private enemies." Id. sec. 1785.

Judge Wilson, formerly of the supreme court of the United States, in the third volume of his works, gives his opinion of the grand jury system in these words: "Among all the plans and establishments which have been devised for securing the wise and uniform execution of the criminal laws, the institution of grand juries holds the most distinguished place." Speaking as to the uncertainty of the date of its origin, and the particulars of its progress and improvement, he concludes: "But one thing concerning it is certain. In the annals of the world there is not found another institution so well adapted for avoiding all the inconveniences and abuses which would otherwise arise from malice, from rigor, from negligence, or from partiality in the prosecution of crimes." 3 Wilson's Works, 363, 364.

Judge Field, of the supreme court of the United States, in his charge to a grand jury of a United States circuit court, referring to the origin and value of the grand jury system, said, *inter alia:* "And in the struggle which at times arose in England between the powers of the king and the rights of the subject, it often stood as a barrier against persecution in his name, until at length it came to be regarded as an institution by which the subject was rendered secure against oppression from unfounded prosecutions of the crown.

"In this country, from the popular character of our institutions, there has seldom been any contest between the government and the citizen which required the existence of the grand jury as a protection against oppressive action of the government. Yet the institution was adopted in this country, and is continued from considerations similar to those which give to it its chief value in England, and is designed as a means not only of bringing to trial persons accused of public offenses upon just

grounds, but also as a means of protecting the citizens against unfounded accusation, whether it comes from the government or is prompted by partisan passion or private enmity." 2 Saw. 668, 669.

The above opinions are not quoted for the purpose of demonstrating that the grand jury system, in the present state of society and legal science, is the best system that has been devised for securing the protection of public and private rights, but rather to show the estimation in which the people may have held it at the adoption of the constitution, and the necessity for great caution on the part of the legislature when dealing with the subject.

The supposition that such important rights could be diverted under cover of a title to prescribe the practice and proceedings of a class of courts of limited criminal jurisdiction would seem to fall within the class of legislation referred to in a note to section 1938 of 2 Story's Constitution, viz.: "It is not often that legislatures are so reckless as to disregard openly and boldly the restraints of the constitution from which they derive their authority, but it cannot be denied that sometimes, when desirous to accomplish something that the spirit and intent of the constitution forbid, they have questioned with close and technical nicety the words employed in order to discover whether it may not be possible to keep within the letter of the instrument, while defeating its plain and manifest purpose."

The only construction of those provisions of the constitution conferring power upon the legislature to abolish the grand jury system, which are consistent with the principles of constitutional law, is that the legislature may abolish the entire system. Changes in the system itself may be made, or regulations made, but no portion of the state or the residents thereof can be deprived of the benefits or securities of the system as changed or regulated. To hold otherwise would be in conflict with

section 1 of the fourteenth amendment of the constitution of the United States, and in conflict with section 25, article 2, of our own constitution, prohibiting the deprivation of rights without due process of law. The two constitutional provisions above mentioned contain practically the same safeguards against the species of legislation under consideration.

The language of the former is: " No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

That of the latter is: " That no person shall be deprived of life, liberty or property without due process of law."

Any act of the general assembly which violates or ignores the foregoing provisions of the federal or state constitution must be held invalid to the extent of such violation.

We come now to consider the legislation in question from a somewhat different standpoint, to wit, whether it affords due process of law within the constitutional meaning of that maxim or principle; and whether it can be said to comprise a part of the law of the land, within the meaning of that phrase.

The rights intended to be protected by the principles embodied in the above phrases are the rights of life, liberty and property; the manner of protecting them by the enactment of general laws recognizing the equal rights of every citizen, and providing for their due and uniform administration.

In order to be constitutional, they must make provision for equal protection to every citizen, in relation to these essential rights, and they must be uniform in their application to every person.

If the law of the state authorizes a prosecution for a felony only upon an indictment of a grand jury, a prose-

cution by another method would contravene the principles just mentioned.

It is pretty generally conceded by those learned in the law that the phrases "due process of law" and "law of the land," although verbally different, express the same thought, and that the meaning is the same in every case. Cooley's Const. Lim. *352, 353; Story's Const. sec. 1943.

Mr. Webster's oft-cited definition of the maxim, "by the law of the land," is as follows: "By the law of the land is most clearly intended the general law; a law which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial. The meaning is that every citizen shall hold his life, his liberty, property and immunities under the protection of the general rules which govern society." *Dartmouth College v. Woodward*, 4 Wheat. 519.

Mr. Justice Johnson, of the supreme court of the United States, gives his view of these phrases thus: "As to the words from Magna Charta incorporated into the constitution of Maryland, after volumes spoken and written with a view to their exposition, the good sense of mankind has at last settled down to this: that they were intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private rights and distributive justice." *Bank of Columbia v. O'Kely*, 4 Wheat. 235–244.

Of the above views of Judge Johnson, Mr. Cooley says: "We have met in no judicial decision a statement that embodies more tersely and accurately the correct view of the principle we are considering."

Mr. Cooley himself defines the maxim thus: "Due process of law, in each particular case, means such an exertion of the government as the settled maxims of law permit and sanction, and under such safeguards for the protection of individual rights as those maxims prescribe

for the classes of cases to which the one in question belongs." Cooley's Const. Lim. sec. 356.

Judge Story defines the privileges and immunities of the citizens of the states thus: "To be protected in life and liberty, and in the acquisition of property, under equal and impartial laws which govern the whole community. This puts the state upon its true foundation, a society for the establishment and administration of general justice — justice to all, equal and fixed, recognizing individual rights and not impairing them."

In speaking of the adoption of the fourteenth amendment to the constitution of the United States, and of the similarity of the guaranties therein to those incorporated in the several state constitutions, the same author says: "It is further declared by this article that 'no state shall deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.' In a country where the rights of the individual citizen were already so well guarded it might seem like a work of supererogation to establish new guaranties which, after all, in their purpose must have the same end as others already existing, and in their scope can perhaps embrace no more. * * * The securities of individual rights, it has often been observed, cannot be too frequently declared, nor in too many forms of words; nor is it possible to guard too vigilantly against the encroachments of power, nor to watch with too lively a suspicion the propensity of persons in authority to break through the 'cobweb chains of paper constitutions.'" Story's Const. secs. 1935–1938.

In the case of *Rowan v. State*, 30 Wis. 129, the question of the power of a state to abolish the grand jury was considered with reference to the principles now under consideration.

Judge Cole, in delivering the opinion of the court, after referring to the origin and design of the fourteenth

amendment to the constitution of the United States, observed: " But its design was not to confine the states to a particular mode of procedure in judicial proceedings, and prohibit them from prosecuting for felonies by information instead of by indictment, if they chose to abolish the grand jury system. And the words ' due process of law ' in this amendment do not mean, and have not the effect, to limit the powers of the state government to prosecutions for crimes by indictment; but these words do mean law in its regular course of administration according to the prescribed forms, and in accordance with the general rules for the protection of individual rights."

The learned judge concludes that " if the people of the state find it wise and expeditious to abolish the grand jury, and prosecute all crimes by information, there is nothing in our state constitution as it now stands, and nothing in the fourteenth amendment to the constitution of the United States, which prevents them from doing so."

Mr. Justice Mathews, in *Hurtado v. California*, in demonstrating that due process of law, as employed in the fourteenth amendment, does not necessarily mean the institution and procedure of a grand jury in any case, says: " If, in the adoption of that amendment, it had been part of its purpose to perpetuate the institution of the grand jury in all the states, it would have embodied, as did the fifth amendment, express declarations to that effect."

Justice Mathews proceeds to explain that the legislative powers of the states are not absolute and despotic, and it must not be supposed that the said fourteenth amendment prescribing due process of law is too vague and indefinite to operate as a practical restraint. The learned justice, while recognizing the inherent and reserved powers of the states to make their own laws and to alter them at pleasure, plainly says that these reserved

powers must be exerted within the limits of those fundamental principles of liberty and justice which lie at the base of all our civil and political institutions.

He then proceeds to explain that the legislative powers of the states are not absolute and despotic, but that the due process of law, prescribed in the fourteenth amendment, may operate as a practical restraint "upon special, partial and arbitrary exertions of power under the forms of legislation."

This learned jurist further says: "It is not every act legislative in form that is law. Law is something more than mere will exerted as an act of power. * * * And the limitations imposed by our constitutional law upon the action of the governments, both state and national, are essential to the preservation of both public and private rights, notwithstanding the representative character of our political institutions." *Hurtado v. California,* 110 U. S. 535, 536.

From the foregoing expositions of the subject it is evident that a state which recognizes in its general course of legislation and judicial proceedings the fundamental principles of constitutional government, as embodied in the principles of the common law, conforms to the spirit and meaning of the maxims referred to. Properly construed these maxims interpose no barriers in the way of wholesome legislation of any kind, but they prevent special and class legislation, and all forms of legislation the effect of which is to extend privileges or securities to a portion of the community which are withheld from another portion, although relating to the same class of subjects.

So far as the laws are conformable to the constitutional provisions guaranteeing equal and impartial security and protection of the rights of the whole community, they become the law of the land, and the adjudication of individual rights thereunder is by due process of law.

The same principles are applicable whether we refer to

the enactment of laws by general assemblies, or to their judicial interpretation. They must be so framed and so administered as to come within the constitutional landmarks, abridging the immunities and privileges of no person, but affording equal protection to all.

Our conclusion is that the provisions of the act of the general assembly under consideration, which prohibits the summoning and impaneling of a grand jury, in any criminal court, for the prosecution of felonious crimes therein, and which require the prosecution of all offenses, when originally commenced or instituted therein, to be upon information presented by the district or special district attorney, are in conflict with the mandates of the bill of rights of this state, and are therefore unconstitutional. We are further of opinion that the said criminal court erred in denying the petitioner's motion to quash the information filed against him by the district attorney, charging the petitioner with the commission of a felony, and that the conviction and sentence of the petitioner, upon the prosecution of said information, was absolutely void. It is therefore ordered and adjudged by the court that the petitioner be discharged from confinement in the penitentiary.

And it appearing to the court that sufficient legal cause exists for the commitment of the petitioner to answer any indictment which a grand jury of said county of Arapahoe might find against him in respect to the matters so charged as aforesaid, it is further ordered that the petitioner be remanded to the custody of the sheriff of Arapahoe county, and that upon entering into a recognizance before said sheriff in the sum of $1,000, with good and sufficient sureties to be approved by the said sheriff, conditioned for his appearance at the next term of the district court of said county, to answer any indictment that may be found against him concerning the alleged felony, he be discharged from custody.