No. 18,183.

PEOPLE OF THE STATE OF COLORADO, plaintiff, W. GRANT CHESTER, Intervenor v. CARL E. ENLOW AND ARTHUR WERMUTH.

(310 P. [2d] 539)

Decided April 22, 1957.

Mr. BERNARD P. O'KANE, Mr. CARL CLINE, for the People of the State of Colorado.

Messrs. HORNBEIN & HORNBEIN, Mr. ROY O. GOLDEN, for intervenor.

Messrs. ROBINSON & CURRAN, for defendant Carl E. Enlow.

Mr. THOMAS J. CARNEY, Mr. IRA C. ROTHGERBER, JR., for defendant Arthur Wermuth.

*En Banc.*

MR. JUSTICE FRANTZ delivered the opinion of the Court.

ON January 11, 1957, the District Attorney for the First Judicial District filed an original proceeding in this

court in the nature of quo warranto under Rules 106 and 116 R.C.P. Colo. Named as the defendant was Carl E. Enlow, the person who was then in possession and control of the office of Sheriff of Jefferson County, Colorado. It was alleged in the complaint that a vacancy occurred in the office when Enlow was convicted of an infamous crime involving a violation of his official oath, and that such conviction automatically worked a divestiture of the authority and accoutrements of the office, notwithstanding which Enlow purported to act as Sheriff for the County.

Because the question thus presented was deemed publici juris, this court agreed to act, and in that behalf issued a rule to show cause to Enlow. The impact of the various functions and activities of the office on the public, all in the exercise of the prerogatives thereof and in the enforcement of the civil and criminal process of the courts, prompted us to accept the responsibility of original jurisdiction. Art. VI, Sec. 3, Constitution of Colorado; *State v. Sullivan,* 49 Ariz. 51, 64 P. (2d) 809. To refuse to hear and determine the matter at the earliest convenient date seemed against the best interests of the public, particularly since the longer Enlow held and exercised the prerogatives of the office, if the exercise thereof proved unwarranted, the more problems would multiply which might subsequently vex the courts.

Enlow had been elected in November 1954 to the office of Sheriff of Jefferson County, and qualified and assumed his duties in January 1955. In March 1956 Enlow was indicted by the federal grand jury. He was charged in two counts with federal income tax evasion for the years 1949 and 1950 in violation of Section 145 (b) of the Internal Revenue Code [26 U.S.C. Section 145 (b)]. In each count it was alleged that Enlow made false and fraudulent tax returns in that he failed to report his full income for each of these years. Enlow was thus charged with violation of a federal law in the United States District Court for Colorado.

To the indictment Enlow pled not guilty; trial was had before a jury on the issues thus joined; and on June 27, 1956, he was found guilty on the first count and not guilty on the second. A sentence that he be imprisoned for three years and fined $500.00 was immediately imposed. From this sentence Enlow appealed to the United States Court of Appeals for the 10th Circuit. On January 2, 1957, said appellate court affirmed the judgment and sentence of the federal district court.

While these court proceedings were running their course, certain events were transpiring in the county affecting the office of Sheriff. Just prior to the imposition of the sentence upon Enlow, the Board of County Commissioners of Jefferson County considered a resolution demanding that Enlow tender his resignation. This resolution was defeated by a vote of two to one. On January 7, 1957, and before the decision of the Court of Appeals became final, the Board of County Commissioners as then constituted held its last meeting, and adopted a resolution appointing W. Grant Chester, the Intervener herein, to the office of Sheriff for Jefferson County. Two voted for the resolution, and the third abstained from voting. Enlow refused to surrender the office to Chester.

In the afternoon of January 11, 1957, and still at a time before the decision of the Court of Appeals became final, Enlow tendered his resignation to the Board of County Commissioners as newly constituted following the November 1956 election. Enlow's resignation was accepted immediately, and the Board thereupon appointed Arthur Wermuth, later made a party defendant herein, to succeed Enlow, and Wermuth has been in possession and control of the office, and functioning as Sheriff of the County since this appointment.

Despite the changing circumstances, the controversy continues; Enlow's resignation and the resultant action of the Board metamorphosed the original dispute in this court from charged usurpation of office by Enlow to a contest between Wermuth and Chester over who is

rightfully and appropriately appointed to succeed Enlow. Notwithstanding the change in the cast of characters and the factual situation, the public nature of the problem remains and we proceed to its resolution.

C.R.S. '53, 35-1-5, ordains that in any of seven situations a county office becomes vacant. We are concerned with only two (the second and fifth), but illumination is shed on the construction to be given the pertinent parts by a consideration of the whole. The section provides that "Every county office shall become vacant, on the happening of either of the following events, before the expiration of the term of office: (1) The death of the incumbent. (2) His resignation. (3) His removal. (4) His ceasing to be an inhabitant of the county for which he was elected or appointed. (5) His conviction of any infamous crime, or any offense involving a violation of his official oath. (6) His refusal or neglect to take his oath of office, or to give or renew his official bond, or to deposit such oath and bond within the time prescribed by law. (7) The decision of a competent tribunal, declaring void his election or appointment."

In our view of the statute, a county office becomes vacant by operation of law when the incumbent is convicted of an infamous crime, or when he is convicted of any offense — whether felony or misdemeanor —, if it involves a violation of his official oath. *People ex rel. v. Laska,* 101 Colo. 221, 72 P. (2d) 693. Stated otherwise, a conviction of either offense automatically causes a vacancy in the office. *In re Obergfell,* 239 N.Y. 48, 145 N.E. 323; *State v. Sullivan,* 66 Ariz. 348, 188 P. (2d) 592; *State v. Jurgensen,* 135 Neb. 136, 280 N.W. 886.

Any other construction would do violence to plain, unequivocal language. Indeed, so simple, direct and integrated is the language of C.R.S. '53, 35-1-5, that there is no room for interpretation as to when a vacancy occurs. The happening of the event fixes the time and fulfillment of the vacancy. The mingling of situations which ordinarily would give rise to vacancies ipso facto

with others that do not necessarily create vacancies ipso facto, without difference of treatment in the statute, is significant. Thus, among the listed events creating a vacancy in office are three which by their very nature result in termination of office-holding, and the statutory declaration that the office becomes vacant upon the happening thereof seems almost surplusage. Reference is made to the provisions relating to the death of an incumbent, or his resignation, or his removal; the occurrence of any of these events establishes instanter a vacancy. To hold that the death of an incumbent, or his resignation, or his removal effects an immediate vacancy in the office but that the same is not true as to an officer convicted of either of the described offenses would result in a strained, unnatural and illogical construction, in view of the language employed in the statute which makes no such distinction.

Section 145 (b) of the federal Internal Revenue Act provides that:

"Any person required under this title to collect, account for, and pay over any tax imposed by this title, who willfully fails to collect or truthfully account for and pay over such tax, and any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof, shall; in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution."

If Enlow was convicted of violating this section, and if such amounts to conviction of an infamous crime or an offense involving a violation of his official oath, within the purview of C.R.S. '53, 35-1-5, the office of Sheriff of Jefferson County became vacant by operation of law on the date of such conviction.

Was Enlow convicted of violating said Revenue Act prior to January 11, 1957, the date of his resignation, and if he was, was he convicted of an infamous crime or of

an offense involving a violation of his official oath? These are the important questions which must be answered. If *either* question is answered in the negative, Wermuth is the properly appointed Sheriff. If *both* questions are answered in the affirmative, Chester is the properly appointed Sheriff. Important to a consideration of the question of conviction vel non is the fact that Enlow in his answer here denies guilt of the matter charged against him in the federal court.

What meaning should be attached to the term "conviction" as used in C.R.S. '53, 35-1-5 (5)? To define the word is no easy task. Its meaning in other situations has run the gamut of proceedings from a plea of guilty or the verdict of a jury, *People v. Brown,* 87 Colo. 261, 286 Pac. 859, to the last expression of this court, *Read v. Read,* 119 Colo. 278, 202 P. (2d) 953. For the variety of definitions given the word, see 13 C.J. 903 to 910, 18 C.J.S. 97 to 99.

Chester contends that the verdict of the jury constitutes the "conviction" of Enlow, and relies upon *Commonwealth v. Lockwood,* 109 Mass. 323, 12 Am. Rep. 699; *Quintard v. Knoedler,* 53 Conn. 485, 55 Am. Rep. 149, and *Attorney General ex rel O'Hara v. Montgomery,* 275 Mich. 504, 267 N.W. 550, as supporting his position. Wermuth maintains that "'Conviction,' in its legal sense, means a final judgment *conclusively* establishing guilt," 13 C.J. 907, §4, and that the presumptive guilt arising from the verdict of guilty and the judgment and sentence thereon, where the matter pends before an appellate court, is insufficient, relying on language used in *People ex rel. Dunbar v. Moore,* 125 Colo. 571, 245 P. (2d) 467.

This court has considered the word under varying circumstances, and has adopted a different definition in each case. *People v. Brown,* supra, involved the construction of a statute which commenced: "If any person *convicted* of any criminal offense before any justice of the peace shall wish to appeal to the county court, he

or she shall," etc. The court turned "for aid to the more promising rule of reason. To the layman of average education and intelligence the statement that one has been 'convicted' of a crime conveys the impression that he who maintained his innocence has been legally declared guilty. Let the average lawyer be told that an acquaintance has been sentenced for a crime and his natural inquiry would be, 'Did he plead guilty or was he convicted?' Before sentence can be pronounced in a criminal case the record must show guilt. This may appear by plea admitted on order, or by conviction. *In this sense the word conveys the idea of the judicial determination of a contested fact as distinguished from the judicial entry of an admitted fact.* In such sense, we are confident, the lawmakers used it in the section before us." (Emphasis supplied.)

In *Read v. Read,* supra, the husband sought review in this court of an order requiring him "to pay certain expenses incident to the proceeding and other allowances and expenses in connection with a criminal action" against his wife. It was held that the husband "became obligated to support plaintiff, and nothing short of legal wrongful conduct on her part can free him from that obligation. Here there is no wrongful conduct on plaintiff's part yet established, for, notwithstanding the fact that she has twice been convicted of murder of the second degree, *nevertheless, if upon review in this court the judgment of conviction is reversed, she has not been convicted of a felony for which defendant could maintain an action in divorce.*" (Emphasis supplied.)

Where a member of the Colorado bar was indicted for and convicted of the crime of conspiracy to violate the Lindberg Act relative to kidnaping in the federal district court for Western Oklahoma, and was thereafter "sentenced to confinement in a United States penitentiary for a term of ten years," does such conviction work an immediate disbarment in the state even though he denies guilt in the disbarment proceedings? This court made

answer to the question in *People ex rel. v. Laska,* supra, in these words:

"Neither petitioner nor respondent, as our study convinces, has fully apprehended the doctrine of our decisions in disciplinary proceedings based on conviction of felony in courts other than of Colorado jurisdiction. When a member of the bar is convicted of a felony, a Colorado legislative enactment operates to disqualify him from 'practicing as an attorney in any of the courts of this state.' '35 C.S.A., c. 48, §533 (C.L., §7144). Clearly, if in such an instance there has been conviction in a Colorado court, the status of the convicted attorney is fixed by law, and upon formal exhibition of the record we are bound to note the fact and order accordingly, if, indeed, an order is necessary. *But where the conviction has been in a court of another jurisdiction, as here,* and the attorney whose discipline is sought formally invokes that right, we have deemed it consonant with justice to accord him the privilege of denying his guilt notwithstanding his conviction in a 'foreign' court, and to plead facts and circumstances reasonably indicating that he did not have a fair trial, or which import innocence rather than guilt, and have inquiry made under our supervision. People ex rel. v. Brayton, 100 Colo. 92, 65 P. (2d) 1438; People ex rel. v. Burton, 39 Colo. 164, 88 Pac. 1063, 121 Am.St.Rep. 165. Otherwise, as we perceive, the judgment of the convicting jurisdiction would operate extraterritorially, and automatically, as if by lawful mandate, require the ministers of justice of another sovereign jurisdiction to visit an added penalty on him, who, prone and helpless before them, denies his guilt and pleads that which indicates his innocence of the charge in the court of his trial. In an analogous situation, the New York court has said: *'The disqualification created by this statute is consequent only upon a conviction in this state.'* Sims v. Sims, 75 N.Y. 466. * * * Considering that the judgment here must be ours, we think to find the facts upon which to base it, if properly

moved thereunto, also is our responsibility. The sum of our holding heretofore which we now emphasize, *is that where the conviction has not been in our courts, the statute, cited supra (quoted in the Brayton case), and on which the attorney general relies, does not foreclose a respondent as to the fact of guilt, or conclude us in measure of discipline."* (Emphasis supplied.)

Conviction under the statute of an infamous crime, or of an offense involving the violation of the oath of office operates as a disqualification so as to create a vacancy forthwith in the office. Since the statute, providing for vacancies in county offices in certain contingencies, is a disqualifying statute, it is our opinion that *People ex rel. v. Laska, supra,* involving a statute disqualifying lawyers from the practice of law in this state upon being convicted of a felony, is authority on the question of whether Enlow was convicted under such circumstances as to effect an immediate vacancy in his office. In so holding, we apply the doctrine that in the absence of an express statute giving effect, within the state which enacts it, to a conviction and sentence in another jurisdiction, such conviction and sentence can have no effect, by way of penalty, or of personal disability or disqualification, beyond the jurisdiction of the court rendering such judgment. *Logan v. U.S.,* 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429. In applying this doctrine courts have held that federal and state jurisdictions are foreign to each other. *People ex rel. v. Laska, supra; People ex rel. v. Brayton,* 100 Colo. 92, 65 P. (2d) 1438; *People v. Gutterson,* 244 N.Y. 243, 155 N.E. 113; *Brown v. U.S.* 233 Fed. 353, L.R.A. 1917A 1133; *Hildreth v. Heath,* 1 Ill. App. 82. Where an attorney was convicted in the District Court of the United States for Colorado of violating a federal statute, such conviction would be considered by the Colorado court in disbarment proceedings in an evidentiary capacity only, and would not work extraterritorially to effect a disbarment. *People ex rel. v. Brayton, supra.* From these authorities it appears that

a conviction in the federal court for this state is not conclusive on a question of disqualification to hold an office of honor, trust or profit under the laws of Colorado, or to practice as an attorney in any of the courts of this state, in the absence of express statutory language providing for such disqualification.

The refusal to give extraterritorial effect to convictions unless statutory provision is made therefor is settled law. *People ex rel. v. Laska, supra; Sims v. Sims,* 75 N.Y. 466, and *Commonwealth v. Green,* 17 Mass. 515 (both cited in the Laska case); *State ex rel. Mitchell v. McDonald,* 164 Miss. 405, 145 So. 508, 86 A.L.R. 290; *In re Ebbs,* 150 N.C. 44, 63 S.E. 190, 19 L.R.A.N.S. 892, 17 Ann. Cas. 592. That the legislature of this state is thoroughly cognizant of the rule is apparent from its enactments in other circumstances providing for the extraterritorial effect of convictions in other jurisdictions. Thus, C.R.S. '53, 39-13-1 provides that "Every person convicted in this state of any felony who shall have been previously twice convicted upon charges separately brought and tried, *either in this state or elsewhere,* of a felony or of an assault to commit a felony, or of a conspiracy to commit a felony, or, *under the laws of any other state, government or country,* of a crime which, if committed within this state, would be such a felony, shall be adjudged an habitual criminal . . ." C.R.S. '53, 46-1-1, in part reads: "Any marriage may be dissolved and a divorce granted for any one or more of the following named reasons, and no other cause: * * * (8) That the spouse from whom a divorce is sought has been convicted of a felony in a court of record *in any state* since the marriage." C.R.S. '53, 75-2-12 contains in part the following: "No license provided by this Article shall be issued to or held by: * * * (3) Any person who has been convicted of a felony or of any violation of any liquor law *in any federal or state courts of record in the State of Colorado or any other state or territory* . . ."

We attach significance to the failure of the legis-

lature to provide in C.R.S. '53, 35-1-5, for effect to be given to convictions in other jurisdictions. The fact that the legislature has provided in certain statutes that convictions in other jurisdictions shall operate disadvantageously in this state to the convicted person, and did not so provide in C.R.S. '53, 35-1-5, requires us to hold that, as to the latter, the legislature purposely omitted words which would have given effect to foreign convictions. To ascertain the intent of the legislature in enacting a particular statute, resort may be had to a comparison in language of the statute under study with analagous but unrelated legislation, noting the inclusion of certain persons, things, situations, or relationships in the latter not found in the former, and deducing therefrom the intentional exclusion of such persons, things, situations, or relationships from the former. *U.S. v. Columbian, Etc. Bridge Co.,* 99 Fed. (2d) 287; *State v. McCord,* 203 Ala. 347, 83 So. 71.

Is the violation of Section 145 (b) of the Internal Revenue Act the commission of an infamous crime within the meaning of C.R.S. '53, 35-1-5? The answer to this question involves a consideration of certain constitutional and statutory provisions, and of cases construing them. It is our view that the constitutional and statutory provisions hereinafter quoted are in pari materia with C.R.S. '53, 35-1-5, and that all these laws must be construed together, in order to arrive at a proper interpretation.

C.R.S. '53, 39-10-17, provides that "Subject to the constitution of the state, every person convicted of *felony* shall from thenceforth be disqualified from holding any office of honor, trust, or profit under the laws of this state, or practicing as an attorney in any of the courts of this state." (Emphasis supplied.) By the following section (39-10-18) it is provided that "Subject to the provisions of the state constitution, each and every person who may be convicted of the crime of rape, kidnaping, willful and corrupt perjury or subordination

(sic) of perjury, arson, burglary, robbery, sodomy or the crime against nature, incest, larceny, forgery, counterfeiting or bigamy *shall be deemed infamous,* and shall be therefor incapable of holding any office of honor, trust or profit, or voting at any election, of (sic) serving as a juror." (Emphasis supplied.) It is provided by C.R.S. '53, 40-2-31, that "The *infamous crime* against nature, or the attempt to commit said crime, either with man or beast, or any unnatural carnal copulation committed, or the attempt to commit any unnatural carnal copulation per anus or per os or in any other way whatsoever shall subject the offender to be imprisoned in the penitentiary for a term of not less than one year and not more than fourteen years. * * * " (Emphasis supplied.) Article XVIII, Section 4, of our constitution directs that "The term *felony,* wherever it may occur in this constitution, *or the laws of the state,* shall be construed to mean any criminal offense punishable by death or imprisonment *in the penitentiary, and none other."* (Emphasis supplied.)

It is the position of Chester that an infamous crime is one punishable by imprisonment in any penitentiary, and he cites in support of his contention *Ex Parte Wilson,* 114 U.S. 417, 5 S.Ct. 935, 29 L.Ed. 89; *Mackin v. U.S.,* 117 U.S. 348, 6 S.Ct. 777, 29 L.Ed. 909; *In re Claasen,* 140 U.S. 200, 11 S.Ct. 735, 35 L.Ed. 409; *Becker v. Green County,* 176 Wis. 120, 184 N.W. 715; *Crampton v. O'Mara,* 193 Ind. 551, 139 N.E. 360; *Attorney General ex rel. O'Hara v. Montgomery,* 275 Mich. 504, 267 N.W. 550.

We are inclined to hold that C.R.S. '53, 39-10-18 and 40-2-31, supra, are definitive and that infamous crimes are those set forth in these sections. In speaking of these sections, this court has said that they present "the list of infamous crimes as defined by statute." *In re Lowrie,* 8 Colo. 499, 9 Pac. 489; *Koontz v. People,* 82 Colo. 589, 263 Pac. 19. *In re Lowrie, supra,* is authority, in our opinion, for the proposition that in this state all infamous crimes are felonies, but not all felonies are in-

famous crimes. How else may we view this language, "The offense for which he was convicted [grand larceny] came *also* within the list of infamous crimes as defined by statute," when the court had just completed saying, "The petitioner was, therefore, convicted of a felony, as the term is defined by section 4, article 18, of the constitution, which is: 'The term "felony," wherever it may occur in this constitution, or by the laws of this state, shall be construed to mean any criminal offense punishable by death or imprisonment in the penitentiary, and none other' "?

But, if all felonies are to be considered as infamous crimes, Chester is confronted with another impasse. The term "felony," unadorned by words of enlargement or amplification, when used in the statutes of this state has a well-defined meaning, as is disclosed by Article XVIII, Section 4, of the Constitution. *Brooks v. People,* 14 Colo. 413, 24 Pac. 553; *In re Pratt,* 19 Colo. 138, 34 Pac. 680; *Ritchey v. People,* 23 Colo. 314, 47 Pac. 272; *Williams v. People,* 26 Colo. 272, 57 Pac. 701; *People v. Godding,* 55 Colo. 579, 136 Pac. 1011; *Martin v. People,* 69 Colo. 60, 168 Pac. 1171; *Eckhardt v. People,* 126 Colo. 18, 247 P. (2d) 673; *Smalley v. People* (Colo. 1956), 134 Colo. 360, 304 P. (2d) 902. It must be remembered that "under our constitution the test by which to determine whether an offense less than capital shall be deemed a felony or a misdemeanor is made to depend upon whether the same is punishable by imprisonment in the penitentiary or in the county jail." *Brooks v. People, supra.*

A felony involves an "offense punishable by death or imprisonment in *the penitentiary, and none other." "The* penitentiary" does not mean *a* penitentiary or *any* penitentiary; it means *the* penitentiary of this state. Whether infamous or not, an offense is a felony if punishable by death or imprisonment in *the state penitentiary.* The word "the" is a word of limitation — a "word used before nouns, with a specifying or particu-

larizing effect, opposed to the indefinite or generalizing force of 'a' or 'an.' " *U.S. v. Hudson,* 65 Fed. 68. In construing as a ground for divorce, "Being sentenced to the penitentiary, and not pardoned before being sent there," the Supreme Court of Mississippi said in *Daughdrill v. Daughdrill,* 180 Miss. 589, 178 So. 106: "It will be noted that the language of the statute is 'being sentenced to *the* penitentiary.' In 19 C.J., p. 43, §78, it is stated that, 'unless otherwise expressed in the statute, conviction and imprisonment without the state is not a cause for divorce.' To like effect is 9 R.C.L., p. 320, §96. Also see Amis on Divorce and Separation, §140. That writer says, referring to this language: 'Clearly that does not mean *a* penitentiary, or *any* penitentiary, but only *the* penitentiary of this state.' " (We adopt the emphasis of the court, used in this case.)

■ Conviction of a felony, whether it be infamous or otherwise, has a restricted scope, except where broadened by statutory language to include conviction in other jurisdictions (as witness our divorce and habitual criminal statutes, supra.) "The term felony, wherever it may occur in this constitution, or the laws of this state, shall be construed to mean *any offense, and no other,* the penalty for which shall be death or imprisonment in the *state penitentiary."* (Emphasis supplied.) *People v. Godding, supra.* "If the penalty is imprisonment in the *state penitentiary,* it is considered a felony, and if by fine or imprisonment in the county jail, a misdemeanor." (Emphasis supplied.) *Eckhardt v. People, supra.*

C.R.S. '53, 35-1-5, does not explicitly or implicitly reach a conviction in another jurisdiction. The only county officer whose office becomes automatically vacant by its terms is he who commits and is convicted of a felony (using infamous crime in its broadest sense) punishable by death or imprisonment in the state penitentiary. But Enlow was not convicted of such felony; he was convicted of a felony punishable in a federal

prison. It follows, therefore, that there was no vacancy in the office of Sheriff until Enlow resigned.

The meaning given to the words "the penitentiary" by our court is consonant with decisions from other jurisdictions. It was said of a statutory provision similar to our constitutional provision, "I think it quite clear that the disqualification created by this statute is consequent only upon a conviction in this state." *Sims v. Sims, supra,* cited with approval in the Laska case, supra. In a disbarment proceeding the Supreme Court of North Carolina was called upon to determine whether a conviction in a federal court in Louisiana of forging certain receipts worked a forfeiture of the privilege to practice law where the statute provided "That an attorney at law must be disbarred and removed for the following causes: (a) Upon his being convicted of a crime punishable by imprisonment in *the penitentiary* . . ." The majority and dissenting opinions reveal that dissension arose over the construction to be given to the words, "imprisonment in the penitentiary." The majority held that a conviction in another jurisdiction was not within the terms of the statute. *In re Ebbs, supra.* It was held in *State v. Burnett,* 184 N.C. 783, 115 S.E. 57, in a case involving a liquor violation, as follows: "The Polk County Act provides that upon conviction for manufacturing liquor, the convicted person may be imprisoned in the penitentiary. The act, of course, uses the term 'penitentiary' in accordance with its ordinary signification, which is 'state's prison.' " See also *State v. Delmonto,* 110 Conn. 298, 147 Atl. 825; *Queenan v. Territory,* 11 Okla. 261, 71 Pac. 218, 61 L.R.A. 324.

Enlow was convicted of a violation of the federal Internal Revenue Code. Chester would have this court consider the evidence before the federal trial court as establishing disqualification. It is said that this evidence will reveal that Enlow accepted pay-offs for illegal operation of slot machines and other gambling devices in Jefferson County, and failed to report said pay-offs in

his income tax returns; that his failure to make such reports resulted in the conviction. By the language of the statute a vacancy is created when a conviction is had of a county officer of an offense involving his official oath. Enlow was not convicted of accepting pay-offs; he was convicted of an income tax evasion. Such an offense does not involve the violation of his official oath, for his oath is as follows:

"I, Carl Enlow, do solemnly swear by the ever living God, that I will support the Constitution of the United States and the State of Colorado, and faithfully perform the duties of the office of Sheriff, upon which I am about to enter."

Enlow was neither charged with nor convicted of taking pay-offs. The mere doing of a prohibited act by an official, without his conviction therefor, does not create a vacancy. *State v. Henderson,* 166 Miss. 530, 146 So. 456.

It has been suggested that such construction gives an officer-holder who is a law violator the power to retain his office, and that the county is rendered helpless to remove such unworthy servant. But the law has provided other machinery for removal. The people of Jefferson County were not remediless; they could have instituted proceedings, which might have resulted in Enlow's removal from office long before he tendered his resignation. The remedy is contained in the following language from C.R.S. '53, 40-7-47: "Every * * * sheriff * * * who shall be guilty of any palpable omission of duty, or who shall willfully or corruptly be *guilty of oppression, malfeasance* or partiality in the discharge of his duties, shall upon conviction thereof be fined in a sum of not exceeding two hundred dollars. The court shall have the power *upon the recommendation of the jury to add to the judgment of the court that any officer so convicted shall be removed from office.* * * * It shall be the duty of the court when the judgment shall extend to removal from office, to cause immediate notice of

such removal to be given to the proper department, in order that *the vacancy thus occasioned may be filled.*" (Emphasis supplied.) In its wisdom the legislature made the fine which could be imposed nominal so that the jury would have no reluctance in recommending removal in a case warranting such action. Thus, it will be seen that the acceptance of pay-offs, if proved, might have resulted in the removal of Enlow in a proper proceeding, timely brought.

Two matters remain to be discussed. Much was said in oral argument about the failure of the legislature to label as infamous crimes murder and treason, and that therefore the court should not construe as descriptive of infamous crimes C.R.S. '53, 39-10-18 and 40-2-31. It has been stressed in the briefs and was stressed in oral argument that public policy demands an interpretation of the laws in such manner as would work the automatic severance of Enlow from office upon his conviction as here appears, because of the baleful and baneful influence in a political light of any contrary ruling. But we are confronted with laws as they are and not, may we say for the sake of argument, as they should be; and, under such circumstances, we merely counsel that such arguments are better addressed to the legislature than to the courts. Whatever may be the true policy of the lawmaking body to pursue is a matter for that department of government to determine. The responsibility and true policy of the courts to pursue is to analyze and resolve the law as it is, and, if it is not what it ought to be, to leave it to the lawmakers to change it. *Board of Trustees v. Starasinich,* 128 Colo. 556, 264 P. (2d) 1033; *Cole v. Lindsey,* 120 Colo. 501, 211 P. (2d) 544.

■ We conclude that Enlow was not convicted of an offense within the terms of C.R.S. '53, 35-1-5, by the mandate of which a vacancy automatically would occur in the office; that the office became vacant only by reason of his resignation; and that the appointment of Wermuth upon the acceptance of such resignation con-

stitutes him the lawful Sheriff of Jefferson County. The rule to show cause heretofore issued herein is discharged.

Mr. Justice Day specially concurring in the result only.

Mr. Justice Day specially concurring in the result.

I agree that defendant Arthur Wermuth is the duly appointed and qualified sheriff of Jefferson County, but if the majority opinion in this case is to be the law of this state in the future governing disqualification of persons convicted of infamous crimes or felonies to hold office, then I wish to make it clear that I had no part in the making.

While it is a matter of debate, by no means settled, that conviction such as would create automatic vacancy in a county office means *final conviction* (after all appellate remedies are exhausted), I am in agreement that as of January 11, 1957, Enlow was the sheriff. This is so because on that date Enlow was in a position to pursue additional review in the appellate courts of his conviction by a federal jury. On this point the majority opinion and I agree. If the court had stopped there, as well it could and should have under the facts before us, I would append my Amen to the pronouncement. Beyond that I refuse to be involved. I am convinced that if Enlow had not resigned on January 11th, on the 12th, when he abandoned further appellate proceedings and accepted the conviction and sentence of the court, it would have as effectively, and ipso facto, vacated the office as would his death or resignation. As I read the pronouncement of my brethren of the majority, *if* Enlow had not resigned, he would still be sheriff of Jefferson County, notwithstanding his *final conviction* of a felony in the federal courts and notwithstanding that he now languishes in a federal penitentiary. As I read the opinion, it would require some laborious and circuitous procedure to be instituted, by whom we know not, successfully to

rid a county of a faithless county public official who by his indiscretions, aye even his outright disregard of the law, has managed to confine his unlawful acts exclusively within the realm of federal law. I contend that infamy is universal and universally recognized. It has no narrow or ambiguous meaning. I believe that *final* conviction of an *infamous* crime, no matter where committed, and regardless of the court in which conviction is had, works an automatic and ipso facto vacancy in a county office pursuant to the clear and unequivocal provisions of C.R.S. '53, 35-1-5. I do not find in the majority opinion solid authority for the declaration that infamous crime within the meaning of the statute means only those felonies committed in the state of Colorado and which subject the perpetrator to punishment in the Colorado penitentiary. The Supreme Court of the United States, the highest authority we recognize in constitutional and statutory interpretation, defines the word "infamous." To follow its definition would give full protection to the public and would not offend against just and reasonable construction of our statutes. Other states have so declared. *Becker v. Green County,* 176 Wis. 120, 184 N.W. 715; *Crampton v. O'Mara,* 193 Ind. 551, 139 N.E. 360.

The United States Supreme Court in *Ex Parte Wilson,* 114 U.S. 417, considered the question of infamous crimes and punishment, and we there find these quotations:

"The question is whether the crime is one for which the statutes authorize the court to award an *infamous punishment,* not whether the punishment ultimately awarded is an infamous one. * * * " (Emphasis supplied.)

The court further stated:

"For more than a century, imprisonment at hard labor in the State prison or penitentiary or *other similar institutions* has been considered an infamous punishment in England and America. * * * " (Emphasis supplied.)

" * * * our judgment is that a crime punishable by

imprisonment for a term of years at hard labor is an infamous crime, * * *."

Thus the court reaffirmed the original construction of these terms in *Mackin v. United States,* 117 U.S. 348.

A quotation from *Crampton v. O'Mara, supra,* involving a city councilman and a violation of a federal statute concerning the right of citizens to vote ·in elections for United States Senator, points up the inconsistencies and the danger of limiting infamous crimes to those against the laws of the state only. In construing a statute similar to ours, the court said:

"It was suggested at oral argument that the power of the Legislature is limited to infamous crimes against the laws of the state; that is to say, those guilty of infamous crimes against the laws of the United States and sister states, *are eligible,* while those guilty of infamous crimes against the laws of this state are ineligible. We. cannot assent to the proposition that the framers of our Constitution intended a thing so anomalous, illogical, and unjust.

"We hold that, * * * a person who has been convicted of an infamous crime within the definition hereinbefore set out, either against the laws of the State, the United States, or a sister state, is disqualified for office in this state." (Emphasis supplied.)

Historically, the statute under consideration here was one adopted by our pioneer legislature in territorial days. It was carried over by the legislature when the transition was made from Territory to Statehood and Colorado was admitted to the Union. It is significant that the framers of our state Constitution had come from other states, and they and their fellow citizens of the new state had trekked across the plains in covered wagons. It is significant also that those who were to come after them would, for the most part, be from "foreign" jurisdictions, the then existing sister states. The strong arm of the law in those days was the United States Marshal. In such a background and setting is it to be thought that

the writers of the Constitution had in mind that those convicted of felonies and infamous crimes in other jurisdictions or under the federal law were *not* to be disqualified from holding office; practicing law; voting or serving on a jury within the plain meaning of the several statutes on this subject? We in this country have marveled that the constitutions of the several states and the Constitution of the United States have endured down through the years without many necessary amendments. We have been want to ascribe this phenomenon in self government to the virtues of our forefathers in being careful and far-sighted. While this may be true, it is certain that one of the reasons the constitutions have endured is because courts have been alert within the demands of reason and logic to afford wide application to broad constitutional principles, thus contributing to stable and orderly government and a sensible construction of our constitution and laws. The majority opinion would so narrowly construe the laws and constitution as to render them less effective, or if the trend continues, totally ineffectual.

Article XVIII, section 4, defines a felony as follows:

"The term felony, wherever it may occur in this constitution, or the laws of the state, shall be construed to mean any criminal offense punishable by death or imprisonment in the penitentiary, and none other."

I find the majority opinion amending this section by the insertion of the words "of this state." I quote from the opinion:

"A felony involves an 'offense punishable by death or imprisonment *in the penitentiary,* and none other.' 'The penitentiary' does not mean *a* penitentiary or *any* penitentiary; it means the penitentiary of this state."

The opinion also adds that punishment by death must be in the Colorado state penitentiary likewise to be a capital offense, but we need not concern ourselves with that because if a person is executed, no matter where, there would be no problem.

I cannot agree that the words *"the penitentiary"* as used in the constitution is so limited as to refer only to the Colorado State Penitentiary. A sufficient answer to such narrow construction is furnished by Mr. Justice Burke in *People v. Kilpatrick*, 79 Colo. 303, 245 Pac. 719:

"The construction given the act in question by the trial court is fraught with such momentous and disastrous results that we need go no further than invoke against it the fundamental rule that absurd interpretations will not be given statutes when reasonable ones may be resorted to. A reasonable one here lies at hand."

I believe a more reasonable construction of the constitutional definition of a felony lies at hand; that what the framers of our constitution had in mind was punishable "in the penitentiary" (of the jurisdiction administering or prescribing such punishment). I pose the question, "Were the framers of the constitution and the legislature less adept at clear expression than the courts? The legislature attempting to further define the difference between a felony and misdemeanor enacted C.R.S. '53, 39-10-19, as follows:

"Penalty not fixed by statute — punishment. — In all cases where an offense is denominated by statute as being a felony, and no penalty is fixed in the statute therefor, the punishment shall be not more than five years in *the* penitentiary. In all cases where an offense is denominated a misdemeanor, and no penalty is fixed in the statute therefor, the punishment shall be not more than one year in *the* county jail, or a fine of not more than three hundred dollars, or both such fine and imprisonment in the discretion of the court." (Emphasis supplied.)

Likewise the majority opinion quotes from *Brooks v. People,* 14 Colo. 413, 24 Pac. 553, and *People v. Godding,* 55 Colo. 579, 136 Pac. 1011, as follows:

" * * * under our constitution the test by which to determine whether an offense less than capital shall be

deemed a felony or a misdemeanor is made to depend upon whether the same is punishable by imprisonment in *the* penitentiary or in *the* county jail." (Emphasis supplied.)

Both the legislature and the court in expressing the difference in the constitutional definition of felony and misdemeanor used the word "the" in two places, both of them modifying a noun; one *"the penitentiary"* and the other *"the county jail."* The majority opinion would construe the first "the" as limiting it to the *Colorado State* Penitentiary. How then would they construe the second "the"? There are sixty-three county jails in the state of Colorado! To which county jail does the law or the court's opinion refer in defining misdemeanor? The answer it seems is plainly "the" county jail (of the jurisdiction administering or prescribing the punishment). If we can understand the use of the word "the" when referring to a number of county jails, I think it is not strained construction to say that the framers of the constitution intended the words "the penitentiary" to refer to such institutions in the several states or of the United States.

Another point should be noted. The majority opinion overlooks the gist of the federal offense of which Enlow now stands convicted and for which he is now confined in the penitentiary *prescribed by the United States District Judge.* The gravamen of the charge is the filing of a "false and fraudulent" tax return. Fraud, deceit, misrepresentation or any form of lying is infamous whether in Colorado or elsewhere. We have a similar provision in the state income tax law taken almost verbatim from the Congressional Act. Thus, according to the opinion, we may envision a county official convicted of evading state income taxes by the filing of false and fraudulent returns, and therefore subject to immediate removal from office, while another official, who had *merely defrauded the United States,* is permitted to continue in office because he had not offended against the

laws of Colorado. In my view it is unbecoming for this court to label the laws of the legislature or the language of our historic constitution as being inadequate when by a reasonable interpretation both can be made adequate. It is no answer to suggest that our courts have no responsibility in the matter and the people obliged constantly to run to the legislature for minute and numerous amendments to meet reoccurring judicial opinions. Laws are not easy of amendment. Amending a constitution is even more difficult.

The opinion makes much of what this court has done in disbarment and disciplinary proceedings against lawyers. There is no statute similar to 35-1-5 affecting lawyers. The matter of disbarment and disciplining of lawyers is exclusively within the jurisdiction of the Supreme Court. If a lawyer is convicted of a felony in this or any other state or by federal law and is incarcerated in the penitentiary of the jurisdiction offended against, he is, by reason thereof, as a practical matter, prevented from practicing. The practice of law involves the *personal* representation of clients. If time-consuming procedures are followed in that regard the public is not harmed. If we should grant a person convicted in some other jurisdiction the privilege of practicing in this state, the public can take care of that since there is no compulsion to employ his services. However, there is only one sheriff in a county. He is a law enforcement officer with broad policy making authority. He operates his office by the use of deputies and other employes. To state that one could occupy the office through deputies and others and could dictate policies while languishing in the penitentiary so long as his offense was not against the laws of Colorado, is a construction so strained that I am unable to follow it.

Articles in newspapers and magazines reveal how convicted felons, while serving time in the penitentiary, have built up businesses, accumulated fortunes, played the stock market, taken a wife, and otherwise engaged

in activities common to the privileges normally exercised by law-abiding citizens. With the aid of this opinion county officers, if in a federal prison or the prison of some other state, may operate their offices without restraint while so confined. That the public has no remedy is amply demonstrated in this case where with strong evidence in the hands of United States officials, equally accessible to the district attorney of the county involved during the entire period in which Enlow was attempting to reverse his conviction, no move was made by that officer to oust the sheriff under the doubtful procedure prescribed in the majority opinion. If the district attorney refuses to act, what then is the remedy? My answer is that forfeiture of the office, as I believe the law intended, presents no such dilemma.

Other mischief inherent in the opinion, as I perceive it, is the danger that it appears to broaden the holding in *Smalley v. People,* 134 Colo. 360, 304 P. (2d) 902, which is cited with approval and as authority for some of the pronouncements therein. *Smalley v. People, supra,* does not remotely touch on the question here involved. It should be read only in the light of the problem presented which was simply that since a minor first offender is by law *not liable to punishment* in the state penitentiary, such first offense is not a felony.

In like manner I find in the opinion that the phrase taken from the constitutional definition of a felony "in the state penitentiary and none other" is loosely used in at least one portion of the opinion so as to appear to construe the words "and none other" as relating to "the penitentiary." It is clear, however, that these words relate back to the words "the offense" as clearly set out in *People v. Godding, supra.*